FILED

03/06/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 11, 2018

## STATE OF TENNESSEE v. ANTHONY EUGENE BARNETT

**Appeal from the Circuit Court for Lawrence County**
**No. 34052    Robert L. Jones, Judge**

_____

### No. M2017-02317-CCA-R3-CD[1]

_____

The defendant, Anthony Eugene Barnett, appeals his Lawrence County Circuit Court jury convictions of possession with intent to sell alprazolam, possession of a firearm with the intent to go armed during the commission of a dangerous felony, simple possession of marijuana, and speeding, challenging the sufficiency of the convicting evidence and the trial court's ruling admitting certain evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Brandon E. White, Columbia, Tennessee (on appeal); and William Harris, Assistant District Public Defender (at trial), for the appellant, Anthony Eugene Barnett.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Brent Cooper, District Attorney General; and Christi Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Lawrence County Grand Jury charged the defendant with one count of possession of less than one-half ounce of marijuana, possession with intent to sell alprazolam,[2] possession of a firearm with the intent to go armed during the commission of a dangerous felony, theft of property valued at $500 or less, speeding, and violating the law regarding window tint.

_____

[1] Upon motion by the defendant, this court consolidated the direct appeal of the defendant's convictions in this case with the direct appeal of the revocation of the defendant's probation in case number M2017-02478-CCA-R3-CD.

[2] Alprazolam is commonly known as Xanax.

At the April 26, 2017 trial, Tennessee Highway Patrol Trooper Jeremy Miller testified that in the early morning hours of September 17, 2015, he observed the defendant driving his black Chevrolet pickup truck at 40 miles per hour in a 35-miles-per-hour speed zone "right there in the middle of Summertown." Trooper Miller effectuated a traffic stop, and, as he waited for the defendant to obtain his license, registration, and proof of insurance, he saw "a clear baggy" between the defendant's feet on the floorboard of the truck. The bag appeared to contain marijuana and "little white specks" that might have been "pills or something else." At that point, Trooper Miller ordered the defendant out of the vehicle, and, as the defendant exited the vehicle, Trooper Miller "noticed that he had a firearm on his side" that "was in a holster on his . . . belt." Trooper Miller removed the gun, which was loaded, from the defendant's side and removed the clip. He then patted the defendant down and, inside the defendant's pants pocket, Trooper Miller found "two bundles of cash," the larger of which was bundled "with black tape around it." In total, Trooper Miller recovered $4,906.00 from the defendant's person.

Trooper Miller contacted another trooper, who lived nearby, to assist him in searching the vehicle. Inside the defendant's vehicle, Trooper Miller discovered "the marijuana and the pills that were . . . in the floorboard; found a paper ledger in the center console area. Reviewing the ledger, it appeared that that was drug transactions . . . ." He found "a marijuana roach inside of that ledger." The "ledger" was just a small, bound notebook with a ribbon. The bag in which he had earlier seen the marijuana also contained a smaller cellophane bag that contained some pills.

Trooper Miller testified that, as a matter of routine, he ran the serial number of the pistol taken from the defendant's person through the National Crime Information Center. The results of his inquiry indicated that the gun was stolen. He later confirmed that the gun had been stolen in Lawrence County.

Trooper Miller said that the defendant stated that "he did not smoke marijuana and did not have a prescription for Xanax." The defendant, who had a valid permit to carry a handgun, said that he had purchased the firearm several years earlier. Trooper Miller said that, despite that the defendant had a valid handgun carry permit, he charged the defendant with unlawful weapon possession because he also possessed marijuana and Xanax.

During cross-examination, Trooper Miller stated that he chose to charge the defendant with possession of marijuana for resale, despite the relatively small amount of marijuana recovered from the defendant's truck, because the defendant said that "he did not smoke marijuana." Trooper Miller said that the defendant told him that the marijuana

and pills belonged to a woman he knew, but Trooper Miller "did not think it was the truth," and, as a result, he did not record the woman's name. The defendant claimed that he had such a large amount of cash because "he was self-employed and did odd jobs." Trooper Miller said that he did not count the money in the larger, taped bundle of cash separately from the smaller bundle, explaining, "Once we decided it was going to be a seizure, we just counted it all together."

On redirect examination, Trooper Miller testified that he realized that the tint on the defendant's windows exceeded that allowed by the law, explaining that he had "a tint meter" that he could use to verify that the tint is too dark, but that "pretty much, if you can hold a driver's license on one side of the window, and you can read it," the tint is legal and "if you can't read it, it's definitely too dark." He added that the defendant's "front windshield was tinted past the manufacturer's shade band, which is illegal in itself."

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Laura Cole testified that she analyzed the "plant material and the tablets in this case." Her testing established that the plant material was 1.32 grams of marijuana. She was able to determine that the pill "tablet and fragments" equaled to nine whole alprazolam tablets. Agent Cole said that, to her knowledge, each pill contained two milligrams of alprazolam, but she cautioned that the total pill count was just an estimation.

Daniel Hunt testified that the weapon recovered from the defendant's person was the same weapon that was stolen from Mr. Hunt's truck eight to ten years earlier.

Following Mr. Hunt's testimony, the State rested.

Lorrie Pewitt testified on behalf of the defendant, whom she described as "a real good friend," that the defendant worked in construction and that he had performed cleanup at her mother's home after it burned and repair work on a place for her and her mother to live while the house was being rebuilt. She said that on September 17, 2015, she met the defendant in the parking lot of the Burger King at approximately 4:00 a.m. and gave him $4,000 cash as payment for the work he performed. She said that she asked the defendant to meet her so early in the morning because she was headed out of town that day. Ms. Pewitt said that, in addition to giving the defendant the money, she "asked his opinion about some marijuana." She said that she had the marijuana packaged "[w]ith some Xanax bars." She identified the bag containing the marijuana and alprazolam pills that had been recovered from the defendant's truck as the same bag she gave to the defendant for inspection. Ms. Pewitt said that after the defendant provided

-3-

his opinion on the marijuana, she thought she put it into her back pocket, but apparently it fell into the floor of the defendant's truck.

Ms. Pewitt said that she had a prescription for the alprazolam and that she had the marijuana because she had "a lot of medical issues" and that she thought that using marijuana might help her "get off of some of the narcotics" she was using to treat her medical issues. Ms. Pewitt said that she suffered from rheumatoid arthritis, seizures, degenerating disc disease, an autoimmune disorder, and fibromyalgia. In addition to these ailments, Ms. Pewitt said that she continued to experience pain from injuries she sustained in a car accident.

During cross-examination, Ms. Pewitt said that she sought the defendant's opinion on the use of marijuana as a medication as well as the quality of that particular bag of marijuana. She said that she believed "he knew a little bit about it" because the defendant had previously grown "[m]edical marijuana" "up in Michigan."

Russell Hicks said that, following the defendant's arrest in this case, the defendant came to Mr. Hicks's residence looking for Mr. Hicks's cousin, Colton Rush. Mr. Hicks testified that the defendant told him that Mr. Rush had previously sold him "a nickel-plated Springfield Armory 1911 .45" pistol that turned out to be stolen. Mr. Hicks said that, at that point, "[i]t finally dawned on [Mr. Hicks] that that's where [his] gun had disappeared to." Mr. Hicks identified the firearm that Trooper Miller took from the defendant as having belonged to him. Mr. Hicks explained how he came to possess the gun:

> There used to be an old man that lived behind my house, a man named Jack Russell. He was kind of an alcoholic, so he would end up with stuff a lot of the time that we didn't know where it came from. He had died back in about late 2004 and I just started recently going through his trailer about 2013, 2014. I was cleaning out an old dresser in his little camper he lived in and I pulled out a drawer and when I pulled out the drawer, there was towel stuck behind it. And when I pulled out the towel, that gun was wrapped up in the towel. So I . . . brought it to my house, showed it to my grandparents. They told me to go ahead and clean it up and I just kept it in the house as self-defense.

Mr. Hicks recalled that the gun "disappeared about the middle of 2014."

-4-

Based upon this evidence, the jury acquitted the defendant of theft and convicted him as charged on the remaining counts. Following a sentencing hearing, the trial court imposed a total effective sentence of five years with the effective two-year sentence imposed for the drug possession convictions to be served as supervised probation following the defendant's service of 100 percent of the three-year sentence imposed for his conviction of possession of a firearm with the intent to go armed during the commission of a dangerous felony.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence for his convictions of possession with intent to sell alprazolam and possession of a firearm with the intent to go armed during the commission of a dangerous felony. The defendant also contends that the trial court erred by admitting into evidence the reddish-brown book discovered in the defendant's vehicle, claiming that the State failed to satisfy the prerequisites to its admission.

*I. Sufficiency*

The defendant argues that the evidence was insufficient to support his convictions of possession with intent to sell alprazolam and possession of a firearm with the intent to go armed during the commission of a dangerous felony, arguing that, because the State failed to present sufficient evidence to establish that he possessed alprazolam with intent to sell, it likewise failed to establish that he possessed a firearm during the commission of a dangerous felony. The defendant also asserts that, because the State failed to establish that the pistol in the defendant's possession was actually operational, it failed to prove that he possessed a firearm as defined in the Code.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must

-5-

afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

## A.  Possession of Alprazolam

As charged in this case, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . sell the controlled substance." T.C.A. § 39-17-417(a)(4).  "A violation of subsection (a) with respect to" a "Schedule IV controlled substance is a Class D felony." *Id.* § 39-17-417(e)(2).  Alprazolam is a Schedule IV controlled substance. *Id.* § 39-17-412(c)(2).

The evidence adduced at trial established that, upon stopping the defendant for speeding, Trooper Miller observed a baggy containing marijuana and pills in the floorboard of the defendant's truck.  Trooper Miller seized the baggy, and TBI testing established that the pills were alprazolam.  In addition to the marijuana and pills, Trooper Miller seized from the defendant's person nearly $5,000 in cash, a firearm, and a notebook that, as will be discussed more fully below, could have been a ledger.  The defendant had no prescription for the pills.  Although Ms. Pewitt testified that the drugs belonged to her, the jury was free to reject this testimony.  In our view, this evidence was sufficient to support the defendant's conviction of possession with intent to sell alprazolam.

## B.  Possession of a Firearm

"It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." *Id.* § 39-17-1324(a). "'Firearm' means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." *Id.* § 39-11-106(11). As used in Code section 39-17-1324, "'[d]angerous felony' means," among other things, "[a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance." *Id.* § 39-17-1324(i)(1)(L).  A first-time violation of Code section 39-17-1324(a) "is a Class D felony, punishable by a mandatory minimum three-year sentence to the department of correction," *id.* § 39-17-1324(g)(1), which sentence "shall be served consecutive[ly] to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony," *id.* § 39-17-1324(e)(1).

Here, the evidence adduced at trial established that Trooper Miller recovered a firearm from the defendant's person.  Mr. Hunt, the original owner of the weapon, testified that it was a Springfield Armory 1911 .45 pistol.  Contrary to the

defendant's assertion, the statute does not require a showing that the gun *could* fire but only requires a showing that it was "designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." *Id.* § 39-11-106(11). The gun in this case clearly satisfied that requirement. Additionally, the defendant's citation of Code sections 39-6-1712 and 39-6-1714 are inapt. First, those statutes have been repealed, and the provision regarding the possession of inoperable weapons is now found in Code section 39-17-1302:

> (c) It is an affirmative defense to prosecution under this section that the person must prove by a preponderance of the evidence that:
>
> (1) The person's conduct was relative to dealing with the weapon solely as a curio, ornament or keepsake, and if the weapon is a type described in subdivisions (a)(1)-(4), that it was in a nonfunctioning condition and could not readily be made operable . . . .

T.C.A. § 39-17-1302(c). Second, proof that a weapon "was in a nonfunctioning condition and could not readily be made operable" is an affirmative defense to prosecution for a violation of Code section 39-17-1302; however, the defendant was convicted of violating Code section 39-17-1324. Finally, even if Code section 39-17-1302(c) could be said to apply in this case, the statute clearly provides that it operates as an affirmative defense, and, because the defendant did not plead that section prior to trial, it would be waived.

## *II. Admission of Book*

The defendant also asserts that the trial court erred by admitting into evidence the reddish-brown book recovered from the defendant's vehicle, arguing that the State failed to lay a proper foundation for its admission and that without the proper foundation, the book was irrelevant. The defendant also contends that the State failed to satisfy the authentication requirements of Tennessee Rule of Evidence 901. The State claims that the trial court did not err by admitting the book into evidence and that, even if the trial court did err, the error was harmless given the other proof of the defendant's guilt.

During Trooper Miller's direct examination testimony, he related the discovery of the notebook in the defendant's car, and the trial court cautioned Trooper Miller to "just call it a book" until the State could offer more information. In describing the book, Trooper Miller said that he "scrolled through it" and saw "what appeared to

[be] dollar amounts." The trial court sustained the defendant's objection to the witness's giving his opinion about the contents of the book. Nevertheless, when asked to describe the entries in the book, Trooper Miller said, "I see numbers and totals, and there is words like pills and Viagra, and some other things that made me think this was a ledger." The defendant objected again, and the trial court sustained the objection. The court then provided the following curative instruction:

> Let me explain to you all, all witnesses are entitled to testify about relevant facts that they saw, or actually heard in the occurrence of an event. But they're not allowed to give opinions or conclusions based on those facts unless the questioning lawyer lays a foundation to show that witness is an expert. . . . [B]ut generally, witnesses can't give opinions. The main reason is that's stepping on the jury's toes. It's up to the jury to decide what the conclusion is from the facts, but now, in some cases, the attorney may be able to lay a foundation based on education, training, experience, and actually get an opinion from a witness, but now that may be harder to do with regard to books and numbers. . . .

At that point, the State sought to introduce the book without further examination of its contents. The defendant objected, and the trial court reserved ruling until the conclusion of cross-examination. The trial court later admitted the book into evidence without further comment on the merit of the defendant's objection.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, that court's ruling will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz,* 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. John David Patterson*, No. M2016-01716-SC-R11-CD, ___ S.W.3d ___ (Tenn. Dec. 10, 2018) (citing *Howell v. State*, 185 S.W.3d. 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Here, Trooper Miller testified that he discovered a reddish-brown notebook during his search of the defendant's car, and he identified the notebook admitted into evidence as the same notebook he found in the defendant's car. Although the trial court sustained the defendant's objection to Trooper Miller's classifying the notebook as a drug ledger, the court observed that the jury was free to draw that conclusion based upon its own examination of the book. That Trooper Miller was prohibited from testifying that the notebook was a drug ledger was irrelevant to the determination whether the notebook was properly authenticated under Rule 901; it was enough that Trooper Miller testified that the notebook was what it purported to be, i.e., the same notebook that Trooper Miller seized from the defendant's truck.

### III. Clerical Errors

We observe a clerical error in the judgment that requires the entry of a corrected judgment form for count one. The judgment form indicates that the defendant was originally charged with possession of marijuana as proscribed by Code section 39-17-417. The indictment, however, clearly states that the defendant was charged with simple possession of marijuana as proscribed by Code section 39-17-418 and includes a citation to that statute.

### IV. Probation Revocation

The record establishes that four days after the imposition of the five-year sentence in this case, the defendant, who was on bond pending the outcome of the motion for new trial, was arrested following a traffic stop and charged with possession with intent to sell methamphetamine, simple possession of marijuana, and evidence tampering. A probation violation warrant issued on the basis of the new charges, and, following a revocation hearing, the trial court revoked the probationary portion of his sentence. The defendant filed a separate notice of appeal for the revocation order but later asked this court to consolidate the direct appeal of his convictions in case number W2017-02317-CCA-R3-CD with the direct appeal of the revocation order in case number W2017-02478-CCA-R3-CD. This court granted the order and consolidated the cases. In his appellate brief, the defendant stated that he no longer wished to challenge the revocation of his probation. He did not, however, ask this court to dismiss the appeal in that case. Under these circumstances, we will treat the revocation issue as waived. *See* Tenn. Ct. Crim. App. R. 10(b).

### V. Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE